J-A13041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: X.N.M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 52 MDA 2023 |

Appeal from the Decree Entered December 16, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0141a

| | | |
|---|---|---|
| IN THE INTEREST OF: E.M.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 53 MDA 2023 |

Appeal from the Order Entered December 16, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0142

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 54 MDA 2023 |

Appeal from the Decree Entered December 16, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-143A

J-A13041-23

| | | |
|---|---|---|
| IN THE INTEREST OF: X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 86 MDA 2023 |

Appeal from the Order Entered December 21, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000233-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 87 MDA 2023 |

Appeal from the Order Dated December 21, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000234-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: E.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 88 MDA 2023 |

Appeal from the Order Dated December 21, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000313-2021

- 2 -

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED NOVEMBER 02, 2023**

D.W. ("Mother"), appeals from the December 14, 2022 decrees involuntarily terminating her parental rights to her daughters, X.N.M.R. a/k/a X.R., born in July 2019, E.M.G. a/k/a E.G., born in October 2012, and A.L.R. a/k/a A.R., born in December 2020 (collectively, "the Children").[1] Mother also appeals from the December 20, 2022 orders changing the Children's respective permanency goals from reunification to adoption and establishing a concurrent goal of placement with a legal custodian. In addition, Mother's appointed counsel, Thomas W. Gregory, Jr., Esquire ("Counsel") filed a petition to withdraw and a brief pursuant to **_Anders v. California_**, 386 U.S. 738 (1967), and **_Commonwealth v. Santiago_**, 602 Pa. 159, 978 A.2d 349 (2009). We grant Counsel's petition to withdraw, affirm the termination decrees, and dismiss the appeal from the goal change orders as moot.

We glean the following factual and procedural history of this case from the certified record. In March 2021, the York County Offices of Children, Youth and Families ("the Agency") received a General Protective Services ("GPS") referral related to Mother's substance abuse. Specifically,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decrees entered on the same date, the orphans' court terminated the parental rights of the putative father of X.N.M.R. and A.L.R., R.R. The court also terminated the parental rights of the father of E.M.G., G.G. Neither R.R. nor G.G. filed appeals or participated in the instant appeals.

- 3 -

On March 21, 2021, the Agency received a [GPS] referral for substance abuse for Mother. Allegations received were that Mother had suffered a seizure and when admitted to the hospital she was found to be positive for THC and cocaine. The Agency made contact with Mother via phone on March 22, 2021. Mother agreed to meet with the worker but would not allow the worker to see [X.N.M.R. and A.L.R.] as both parents were very upset. When the caseworker met with Mother, she admitted to cocaine use at a party over the weekend and was agreeable to drug testing. She also agreed to allow the worker to meet the children and this occurred on May 6, 2021. A referral was made to Averhealth[,] but Mother failed to report for testing. On May 10, 2021, the Agency met with Mother due to her lack of testing; she stated she tried to call in but gets busy and forgets. Mother stated she had spoken with an attorney and understood the Agency cannot force her to test. Mother denied being an everyday user of cocaine; she stated it has been in social situations without the children. Mother admitted to daily THC use. On May 14, 2021, the Agency received allegations that Mother had plans to purchase cocaine; Mother denied the allegations. A Safety Plan was initiated[,] and Mother was agreeable to the plan; the Safety Plan provided that Mother's cousin and brother were appropriate supervisors and would supervise her contact. Mother stated to the Agency that [R.R.] had physically assaulted her at the end of April and she had intentions to file a Protection From Abuse Order (PFA) against [R.R.]; she also alleged [R.R.] used cocaine with her in the past. On May 24, 2021, Mother contacted the Agency and advised that she was no longer in agreement with the Safety Plan; she did not feel her children were in danger. Mother stated she had been calling into Averhealth since the Safety Plan was put into place[] but had not reported for a test. Mother was a no show for testing on May 21, 2021; Mother claimed she called in but was not told to report. A referral was made for [Families United Network ("FUN")] and two attempts were made. On May 24, 2021, Mother tested positive for cocaine and THC, Mother denied cocaine use to the tester.

Stipulations of Counsel ("Stipulations"), 11/7/22, at ¶ 6; *see also* Orders of Adjudication and Disposition, 6/7/21, at 1-2. As a result, on May 24, 2021, the Agency obtained emergency protective custody of X.N.M.R. and A.L.R. and placed them in kinship foster care with family friends. *See* Stipulations at ¶ 7.

Subsequently, on June 7, 2021, the court adjudicated X.N.M.R. and A.L.R. dependent and established a permanency goal of reunification.[2] **See** Stipulations at ¶ 10; **see also** Notes of Testimony, TPR Hearing ("N.T."), 12/14/22, at 18-19.

Thereafter,

[o]n July 20, 2021, the Agency received a [GPS] referral regarding substance abuse by parent, lack of supervision, and homelessness. Allegations received were that [E.M.G.] resides with [G.G.] and they [were] to be evicted on July 31, 2021. Further allegations received are that the child is left home alone for unknown amounts of hours and/or days. Other allegations received are that crack was being used in the home. [. . .] On July 22, 2021, the Agency caseworker was conducting a home visit at the foster home of [E.M.G.'s] siblings, where [E.M.G.] was visiting. The Agency caseworker was informed that [E.M.G.] had stated that she has seen [G.G.] smoke cocaine. Furthermore, the child stated that when she had been living with her [m]other, Mother would give her "food with marijuana in it" or "blow marijuana in her face to make her go to sleep[."] The Agency caseworker attempted to contact [G.G.] and traveled to three different places in attempts to locate him. When [G.G.] called the caseworker, he hung up multiple time[s], became angry, and stated there was no reason for the Agency to be involved with his family. [E.M.G. was] to return to [G.G.]'s care on July 23, 2021.

Stipulations at ¶ 6; **see** Order of Adjudication and Disposition, 8/3/21, at 1.

On July 22, 2021, the Agency obtained emergency protective custody of E.M.G. and placed her in kinship care with her siblings, where all three children have remained. **See** Stipulations at ¶ 7; N.T. at 29, 36. On August 3,

---

[2] The court established a concurrent goal of adoption. **See** Orders of Adjudication and Disposition, 6/7/21, at 3.

2021, the court adjudicated E.M.G. dependent and established a permanency goal of reunification.[3] **See** Stipulations at ¶ 10; **see also** N.T. at 19.

The Agency issued family service plans on July 13, 2021, March 18, 2022, May 18, 2022, and November 17, 2022. These plans were forwarded to Mother, and the objectives essentially remained consistent. **See** N.T. at 19-22; **see also** Stipulations at ¶ 13. Corresponding to the terms set forth by the court at the time of adjudication, Mother was required to address, *inter alia*, her substance abuse and housing as well as cooperate with services. **See** Orders of Adjudication and Disposition, 6/7/21 & 8/3/21; Appendix of Court Ordered Services & Conditions; N.T. at 21; **see also** Exhibits 1, 2, 3, and 5.

Throughout the dependency proceedings, the court conducted regular review hearings at which it found Mother was noncompliant with the permanency plan and not progressing toward alleviating the circumstances necessitating placement. **See** N.T. at 20-21; Stipulations at ¶¶ 14-16. Moreover, the court maintained the Children's commitment and placement.

On August 19, 2022, the Agency filed petitions for the involuntary termination of parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (4), (5), (8), and (b) as well as petitions to change the Children's permanency goals from reunification to adoption. Following a continuance on November 14, 2022, the court held a combined hearing on the petitions on December

---

[3] The court established a concurrent goal of adoption. **See** Order of Adjudication and Disposition, 8/3/21, at 3.

- 6 -

14, 2022. Children, who were then three, ten, and two years old, respectively, were represented by both a guardian *ad litem* ("GAL") and legal counsel. Mother was represented by Attorney Gregory but did not appear.[4] The Agency presented the testimony of Lindsay Keller, a supervised bail probation officer with York County Adult Probation; and Vickie Weaver, caseworker.[5]

By separate decrees entered December 16, 2022, the court involuntarily terminated Mother's parental rights to Children. In addition, by separate orders dated December 20, 2022, and entered December 21, 2022, the court changed Children's permanency goals from reunification to adoption and instituted a concurrent goal of permanent legal custody.[6]

On January 9, 2023, Mother filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with respect to the termination decrees. She likewise filed timely notices of appeal and concise statements of errors complained of

---

[4] The court recognized notice *via* publication for the December 14, 2022 hearing, as well as at the prior November 14, 2022 hearing at which Mother also failed to appear. **See** N.T. at 7-9, 122. Notably, Mother's whereabouts were unknown to the Agency. N.T. at 8. Her bail was revoked and there was an outstanding warrant with respect to pending criminal matters. **Id.** at 14 ("She failed to report for her bail supervision, and her bail revocation was submitted to the judge in her three supervised cases, and her bail was revoked. There was a status hearing in her case after the bail revocation. [. . .] She failed to show for that, so the warrant was continued to be active").

[5] Ms. Weaver, who was previously involved with this case as a supervisor, assumed the case in November 2022. N.T. at 17, 42-44.

[6] At the TPR hearing, the court placed its ruling and reasoning on the record, which was transcribed and issued as orders entered on December 20, 2022 (orphans' court docket) and December 21, 2022 (juvenile division docket).

on appeal with respect to the goal change orders on January 10, 2023. This Court consolidated Mother's appeals *sua sponte* on February 3, 2023.

On February 17, 2023, Counsel filed a petition to withdraw, as well as an **Anders** brief. On August 8, 2023, this Court denied Counsel's petition to withdraw and directed him to file either an advocate's brief or a compliant **Anders** brief within 30 days. **Interest of X.N.M.R. a/k/a X.R., E.M.G. a/k/a E.G., & A.L.R. a/k/a A.R.**, 2023 WL 5093865, at *1, 5 (Pa.Super. August 8, 2023) (unpublished memorandum). On September 5, 2023, Counsel filed a new **Anders** brief. Pursuant to a subsequent order of this Court, Counsel likewise re-filed a petition to withdraw on September 25, 2023.

When counsel seeks to withdraw pursuant to **Anders** and its progeny, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw.[7] **See In re Adoption of M.C.F.**, 230 A.3d 1217, 1219 (Pa.Super. 2020) (quoting **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa.Super. 2010)) To procedurally withdraw, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

---

[7] This Court extended the **Anders** procedure to appeals from decrees terminating parental rights involuntarily in **In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992) as well as to appeals involving goal change orders in **In re J.D.H.**, 171 A.3d 903, 906 (Pa.Super. 2017).

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) (citation omitted). Counsel must also "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa.Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for *Anders* briefs:

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 602 Pa. at 178-79, 978 A.2d at 361.

Instantly, Counsel filed a petition to withdraw certifying his conscientious review of the record and determination that Mother's appeals are frivolous. He further attached copies of a *Millisock* letter informing Mother of her rights. Likewise, Counsel has filed an *Anders* brief that substantially complies with the requirements set forth in *Santiago*, *supra*.[8]

---

[8] While we observe Counsel's failure to consistently cite to the certified record, we remain cognizant that the framework of *Anders* and *Santiago* require substantial, not perfect performance. *See Commonwealth v. Wrecks*, 934 A.2d 1287, 1290 (Pa.Super. 2007); *see also Commonwealth v. Redmond*, 273 A.3d 1247, 1252 (Pa.Super. 2022).

Having concluded that Counsel complied with the procedural requirements of **Anders**/**Santiago**, we must next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa.Super. 2018) (*en banc*).

Counsel's **Anders** brief raises the following issues for our review:

Did the [l]ower [c]ourt abuse its discretion and/or err as a matter of law in changing the primary goal to adoption?

Did the [l]ower [c]ourt abuse its discretion and err as a matter of law in granting the Agency's request to terminate Mother's parental rights under 23 Pa.C.S.[A.] Section 2511(a) and (b)?

**Anders** Brief at 2 (parentheticals omitted).

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. **See Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." **In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id**.

The involuntary termination of parental rights is governed at statute by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must first determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

In the case *sub judice*, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (4), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We will analyze the court's termination decrees pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1) "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *C.M.*, 255 A.3d at 363-64 (citation omitted) (footnote omitted). While undefined,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

- 12 -

*L.A.K.*, 265 A.3d at 592 (internal citations and quotation marks omitted). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months…, the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *L.A.K.*, 265 A.3d at 593.

The totality of the circumstances includes consideration of: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact

between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* Our Supreme Court explained that, "the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." *Id.*

With respect to its conclusion that the Agency had presented sufficient grounds to warrant termination pursuant to Section 2511(a)(1), the orphans' court found that Mother failed to "demonstrate[] a proactive commitment and desire" to parent the Children. N.T. at 126. The court recognized that Mother's whereabouts remained largely unknown and her contact with the Agency was limited. *See id.* The court acknowledged her open bench warrant and lack of cooperation and engagement and failure to perform any parental duties, other than limited visitation. *See id.* at 127-29. The court further noted Mother's limited contact with the Children. *See id.* at 129.

Upon review, the record supports termination pursuant to Section 2511(a)(1). Ms. Weaver testified that, throughout the dependency proceedings, Mother had not performed any parental duties or obligations, nor had she made a diligent effort to resume same. N.T. at 36, 38. Significantly, Mother demonstrated an enduring failure to comply with services related to

the causes of the Children's placement since the inception of the dependency proceedings, including court-ordered drug and alcohol and mental health evaluations, and drug testing. Ms. Weaver noted numerous referrals for services to various providers, which were unable to be opened or closed unsuccessfully due to Mother's lack of engagement and/or contact. *See* N.T. at 32-33, 56-57, 62, 64; *see also* Permanency Review Orders, 9/28/22, 4/21/22, & 11/16/21, Status Review Orders, 9/3/21.

The record further reveals limited and inconsistent contact with the Agency by Mother. *See* N.T. at 64; *see also* Permanency Review Orders, 9/28/22 & 11/16/21, Status Review Orders, 2/24/22 & 9/3/21. Ms. Weaver confirmed there was an extended period of time where Mother's whereabouts were unknown.[9] N.T. at 25. Additionally, Ms. Weaver testified that Mother had not been able to obtain and maintain safe, stable, and appropriate housing or provide documentation of a lawful source of income. *Id.* at 26.

Moreover, the record evinces a persistent lack of communication and contact between Mother and the Children. Mother failed to sustain regular, consistent visitation with the Children. *See* Permanency Review Orders, 9/28/22 & 4/21/22, Status Review Orders, 2/24/22 & 9/3/21. As testified by Ms. Weaver, Mother's last contact with the Children was a brief virtual visit on February 25, 2022, approximately six months prior to the filing of the

_____

[9] As stated *supra*, Mother's bail was revoked and there was an outstanding warrant with respect to pending criminal matters. *See* N.T. at 14.

termination petitions and ten months prior to the subject hearing. *See id.* at 27-28, 42, 54, 62. While Mother failed to participate in visits with the Children thereafter, Ms. Weaver confirmed that Mother's ability to visit with the Children was not suspended or limited by the court. *Id.* at 27-28, 42, 62.

Similarly, Mother did not maintain regular telephone contact with the Children. N.T. at 28-29. Although Mother provided gifts on one occasion, Christmas 2021, she did not provide the Children presents or cards on a regular basis. *See id.* at 28-29, 36, 56.

Further, Mother did not attend any of the Children's medical or dental appointments or school-related events. *Id.* at 36. Likewise, she was not present at the subject proceeding or other proceedings throughout the dependency matters. *See id.* at 5; *see also* Permanency Review Orders, 9/28/22 & 4/21/22, Status Review Orders, 2/24/22 & 9/3/21.

As such, the record supports the court's determination that Mother failed to perform her parental duties in excess of six months prior to the filing of the termination petitions. We reiterate that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citation omitted). Im light of the totality of the circumstances, as we discern no error of law or abuse of discretion, we do not disturb the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1).

Having found sufficient grounds for termination pursuant to Section 2511(a)(1), we next must determine whether termination was proper under Section 2511(b), which affords primary consideration to the developmental, physical and emotional needs and welfare of the child. **See T.S.M.**, 620 Pa. at 628, 71 A.3d at 267. "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." **Id.** (internal citations omitted).

As our Supreme Court recently explained in **Interest of K.T.**, 296 A.3d 1085, 1113, (Pa. 2023), "a court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **K.T., supra** (emphasis added).

In addition, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." **Id.** While not inventing an exhaustive list of considerations, the Court explained that the inquiry **must consider and weigh** certain evidence **if it is present in the record**, including, but not limited, "the child's need for permanency and the length of time in foster care [. . .]; whether the child is in a pre[-]adoptive home and

bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (footnote omitted); *see also id.* at n.28 (emphasis in original).

In concluding that termination of Mother's parental rights best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the orphans' court found that the Children's "the strongest parental bond is with the [foster parents ("Foster Parents")] and that all three children look to [Foster Parents] for safety and comfort, not to [Mother], who has been absent from their lives for now an extended period of time." N.T. at 129-30. As such, the court determined that "no long-term negative impact would occur for any of the children if [Mother]'s parental rights were involuntarily terminated." *Id.* at 129.

Upon review, the record supports the finding that termination favors the Children's needs and welfare under Section 2511(b). As indicated above, Ms. Weaver testified that Mother's last contact with the Children was a brief virtual visit on February 25, 2022, ten months prior to the subject proceeding. *See* N.T. at 27-28, 42, 54, 62. The Children are all placed together in a pre-adoptive foster home where they are doing well medically, educationally, and behaviorally. *See id.* at 36, 38-41, 43, 59. Ms. Weaver indicated that the Children's parent-child relationship is with Foster Parents, whom they refer to as "Nana and Pop." *Id.* at 29-32, 59. While testifying that E.M.G. knows who

her parents are, Ms. Weaver explained that E.M.G.'s parent-child bond is with

Foster Parents, with whom she wants to remain:

> Q. Based upon your interaction with the [foster] family and based upon your review of the file and discussions with various service providers, what type of bond does [E.G.] have with her mother or father?
>
> A. [E.G.] is a very smart ten-year-old, has the ability to advocate for herself –
>
> ***
>
> THE WITNESS: -- her wants and needs. So she knows who her parents are, but she's very disappointed that they haven't chose her over the drug use. So she feels safe, comfortable, and knows she's protected by [Foster Parents]. So she has a bond with her foster parents, and she knows that's where she wants to be.
>
> Q. But because of her age, she knows who her mom and dad are, correct?
>
> A. Oh, yes.
>
> ***
>
> Q. What type of bond or relationship does she have with [Foster Parents]?
>
> ***
>
> A. Again, she has a very good relationship with them. She knows that they're not her biological parents, but she knows that she wants to stay there [. . .].
>
> ***
>
> Q. Okay. And are they friends? Is it a friendship relationship? Does she view them as a parental-type relationship?
>
> A. I would say she does view them as parental, as parents. Not biological, but she knows that they provide for her, and she really does know what the difference is, but she does look at them as parental figures.
>
> Q. And when we weigh the bond that she has with her parents versus the [foster] family, where does the stronger parental bond lie?
>
> A. I would say with [Foster Parents] right now.

- 19 -

*Id.* at 29-31 (some brackets in original). Further, given the age of the two younger children, coupled with the amount of time placed with Foster Parents, Ms. Weaver testified that they had no parental bond with Mother and view Foster Parents as parents. *See id.* at 31-32. As such, Ms. Weaver opined that there would be no long-term negative impact on the Children if Mother's parental rights were terminated. *Id.* at 41.

Based on the foregoing independent analysis of the orphans' court's termination of Mother's parental rights, we agree with Counsel that the appeals from the decrees terminating Mother's parental rights pursuant to Section 2511(a)(1) and (b) are wholly frivolous and our review of the record does not reveal any overlooked non-frivolous issues.

Given our disposition concerning termination, Mother's appeals from the goal change orders are moot. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020) (citing *In re D.A.*, 801 A.2d 614, 616 (Pa.Super. 2002)) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees").[10]

For the foregoing reasons, we grant Counsel's petition to withdraw. We affirm the termination decrees and dismiss the goal change orders as moot.

---

[10] Even if not moot, for the reasons we have already discussed throughout this memorandum with respect to termination, the record confirms that changing the Children's respective permanency goals to adoption is in their best interest. *See In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011).

Counsel's petition to withdraw granted. Decrees affirmed. Appeals from goal change orders dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/2/2023